**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| **Anthony Dell Unruh and Sue Nell** | § | **Case No. 04-35947-H1-7** |
| **Unruh,** | § | **(Chapter 7)** |
| Debtors. | § | |

## Memorandum Opinion

For the reasons set forth below, the Trustee's Objection to Debtor's Claim of Exemptions [docket no. 64] is granted.  The Trustee's original Objection to Debtor's Claim of Exemptions [docket no. 47] is therefore denied as moot.  The Motion of Anthony Dell Unruh and Sue Nell Unruh for Abandonment of Homestead or in the Alternative Request for Leave to Amend Exemptions [docket no. 48] is denied.  The Trustee's Amended Motion to Sell Real Property [docket no. 72] is granted.  A separate Order accompanies this Memorandum Opinion.

### Background

The Debtors, Anthony D. Unruh and Sue N. Unruh, filed a voluntary petition under chapter 7 on April 22, 2004.  The Debtors filed Schedules and a Statement of Financial Affairs on May 12, 2004.  The Debtors scheduled one item on Schedule A for real property: 70.429 acres in Dickinson, Texas.  The nature of the Debtors' interest in the property is listed as fee simple, with a current market value of $330,000 and secured claims on the property of $326,832.  Debtors' Schedule C lists the value of their claimed exemption on the property at $3,168.  The Debtors chose federal exemptions pursuant to 11 U.S.C. § 522(b)(1).  The Debtors also exempted their 100 percent interest in Nell International.

On December 23, 2004, the Debtors filed an Amended Schedule C.  Amended Schedule C lists the value of the Debtors' claimed exemption on the same property as the "entire value after liens."  The current market value for the property on the Amended Schedule C remained at

1

$330,000 and the Debtors still chose federal exemptions.  The Debtors again exempted their interest in Nell International.

On January 19, 2005, the Trustee filed an Objection to Debtor's Claim of Exemptions. The Debtors filed a Motion of Anthony Dell Unruh and Sue Nell Unruh for Abandonment of Homestead or in the Alternative Request for Leave to Amend Exemptions on January 21, 2005. On February 1, 2005, the Trustee filed an Objection to Unruh Motion to Abandon or to Allow Leave to Amend.

On February 9, 2005, the Debtors filed their second Amended Schedule C.  This Schedule C listed the property's market value at $700,000, claimed an exemption for 100 percent, and chose the state law homestead exemption pursuant to 11 U.S.C. § 522(b)(2).  The Debtors no longer claimed their interest in Nell International as exempt.  In response, the Trustee filed another Objection to Debtor's Claim of Exemptions on March 1, 2005.

The Debtors split the property into two parcels to facilitate financing.  They subsequently built a home valued at roughly $200,000 on the 30-acre parcel.

The evidence before the Court indicates the following appraisals and valuations:

1.  November 22, 2002 appraisal valuing 71.164 acres at $180,000;

2.  December 10, 2002 appraisal valuing 71.164 acres at $205,000;

3.  December 10, 2002 appraisal valuing 71.164 acres at $430,000;

4.  December 30, 2003 appraisal valuing 71.164 acres at $285,000;

5.  February 20, 2004 appraisal valuing 30 acres at $350,000;

6.  April 26, 2004 Galveston Central Appraisal District (CAD) Property Information lists total market value at $533,730 ($308,730 for 41.164 acres without improvements and $225,000 for 30 acres without improvements);

2

7. January 25, 2005 Galveston CAD valuation at $213,000 ($123,000 for 41.164 acres and $90,000 for 30 acres);

8. April 5, 2005 Galveston CAD Property Information lists total market value at $533,730 ($308,730 for 41.164 acres without improvements and $225,000 for 30 acres without improvements).

The Trustee hired Mary-Ellen Lewellyn as a real estate agent for the estate. Ms. Lewellyn estimated the value of the property in excess of $700,000. Ms. Lewellyn came to that estimated value months after the filing, but the Trustee is under the belief that is not significantly different from the value at filing. The Trustee subsequently obtained an offer to purchase the property for $700,000. That offer ultimately failed to close. Accordingly, little weight is given to the offer.

The Debtors' house with improvements has liens totaling $326,832. The Trustee argues that the improvements have a value equal to the lien. Thus, using the Galveston CAD's valuation, added to the value of the house with improvements, the Debtors should have scheduled the value at roughly $860,562.

The Court held hearings on this matter on March 24, March 25, and April 27, 2005.

### Legal Issues

Pursuant to 11 U.S.C. § 522(b), a debtor may exempt property under the federal exemptions or under state or other applicable exemption laws.

Federal Rule of Bankruptcy Procedure 1009 discusses amendments related to a bankruptcy filing. The Rule states, in relevant part: "A voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed." FED. R. BANKR. P. 1009(a). A debtor is generally permitted to liberally amend

exemptions.  *See, e.g., In re Williamson*, 804 F.2d 1355, 1358 (5th Cir. 1986); *Thompson v. Powell*, 413 F.2d 276, 277 (5th Cir. 1969).

Nonetheless, the right "can be tempered by the actions of the debtor or the consequences to creditors."  *In re Kaelin*, 308 F.3d 885, 889 (8th Cir. 2002).  A court has discretion to deny an amendment to exemptions "where the amendment would prejudice creditors or where the debtor has acted in bad faith or concealed assets."  *In re Hannigan*, -- F.3d --, 2005 U.S. App. LEXIS 10050, at *2 (1st Cir. June 2, 2005); *see also McFatter v. Cage*, 204 B.R. 503, 508 (S.D. Tex. 1996); *In re Williamson*, 804 F.2d at 1358; *In re Kaelin*, 308 F.3d at 888; *In re Doan*, 672 F.2d 831, 833 (11th Cir. 1982).  Either of these two prongs is sufficient to deny an amendment.  *In re Wiliamson*, 804 F.2d at 1358; *In re Grogan*, 300 B.R. 804, 810 (Bankr. D. Utah 2003).  However, the Fifth Circuit has held that "the terms 'bad faith' and 'prejudice to creditors' are terms which are difficult to satisfy and require factual analysis."  *McFatter*, 204 B.R. 503 at 508; *see also In re Williamson*, 804 F.2d at 1358; *Hardage v. Herring National Bank*, 837 F.2d 1319, 1324 (5th Cir. 1998).

"Bad faith is determined by an examination of the totality of the circumstances."  *In re Bauer*, 298 B.R. 353, 356 (B.A.P. 8th Cir. 2003); *see also In re Clemmer*, 184 B.R. 935, 942 (Bankr. E.D. Tenn. 1995) (courts look to the surrounding circumstance); *McFatter* 204 B.R. at 508 (bad faith requires a factual analysis).  There is no bright-line rule for determining when a debtor's actions amount to bad faith.  The debtor's mistaken failure to list an asset or initial silence about an asset is not enough.  *McFatter* 204 B.R. at 508; *see also In re Doan*, 672 F.2d 831 (5th Cir. 1982).  Some form of deception and concealment is required to establish bad faith. *McFatter,* 204 B.R. at 508.

4

While a creditor or trustee's knowledge regarding the asset is one factor to consider, this Court believes that bad faith turns on the debtor's actions, not the creditors' actions or knowledge. The creditors' actions and knowledge are more appropriately considered when evaluating the "prejudice to creditors" prong of this analysis. Under the "bad faith" prong, the efforts of concealment are far more relevant than the effect of concealment. The debtor has the burden to list his assets and amend his schedules as necessary. *In re Park*, 246 B.R. 837, 844 (Bankr. E.D. Tex. 2000) (citing *Jeffrey v .Desmond*, 70 F.3d 183, 186 (1st Cir. 1995)). Debtors have an affirmative duty to disclose all assets—this duty cannot be overemphasized. *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999); *In re Park*, 246 B.R. at 843; *In re Ryan*, 81 F.3d 355, 362 (3rd Cir. 1996).

The requirements necessary for a finding of bad faith are difficult to satisfy. *McFatter*, 204 B.R. at 508. Cases concluding that a debtor acted in bad faith are limited. To date, there are virtually no reported decisions in the Fifth Circuit finding bad faith under an exemption analysis.[1] The few reported cases considering this issue, however, usually find that the debtor simply did not do enough to deceive his creditors. *See, e.g., McFatter 204 B.R. 503.; In re Walker*, 2002 WL 750853 (Bankr. W.D. Mo. April 24, 2002). In *McFatter*, for example, the District Court noted that: "[t]he only behavior by Debtor that the Bankruptcy Court relied upon to conclude Debtor acted in bad faith seems to have been Debtor's silence as to his intent concerning the asset's classification as homestead." *McFatter*, 204 B.R. at 509. The court found that the debtor's actions were suspicious, but that the "Debtor's unsworn declaration and

---

[1] *In re Park*, 246 B.R. 837 (Bankr. E.D. Tex. 2000) is the only case the Court could locate where a court in the Fifth Circuit held that a debtor should be denied his exemption or denied the right to amend his exemption based on bad faith.

arguments create a factual dispute as to the reasons for Debtor's initial failure to present the homestead issue and the nine month delay in doing so." *Id.*

On the other hand, intentionally undervaluing a homestead, for example, has been considered permissible grounds under which to deny an amendment—as it is considered evidence of bad faith. *In re Hannigan*, 2005 U.S. App. LEXIS 10050, at *3; *see also In re Bauer*, 298 B.R. at 356; *In re Roland*, 317 B.R. 402, 415-16 (Bankr. C.D. Cal. 2004). In considering evidence of bad faith, a court considers whether the debtor withheld financial information, filed voluminous exemption schedules, waited an unreasonable period of time to file schedules and statements or to file an amendment of exemptions, provided inaccurate valuations of an exemption, or failed to list a statutory basis for an exemption. *See, e.g., Ward v. Turner*, 176 B.R. 424, 427 (E.D. La. 1994); *In re Brown*, 178 B.R. 722, 729-30 (Bankr. E.D. Tenn. 1995). A debtor's prepetition and postpetition conduct can be considered. *In re Clemmer* 184 B.R. 935, 942 (Bankr. E.D. Tenn. 1995). Generally, a debtor's duty of disclosure "requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions." *In re Bauer*, 298 B.R. at 357.

This Court joins others considering this issue in emphasizing the necessity of honesty in bankruptcy cases, and hesitates to make cheating or dishonesty in the schedules and statements appear attractive or inconsequential. *See, e.g. Id., In re Walker*, 2002 WL at *3; *In re Yonikus*, 996 F.2d 886, 872 (7th Cir. 1993). "If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive." *In re Yonikus*, 996 F.2d at 872. The amendment of schedules is not intended to be a game for debtors to play with trustees. Debtors cannot attempt to play "fast and loose" with the Bankruptcy Code's disclosure requirements. *In re Park*, 246 B.R. at 843. Intentional

concealment of assets and liabilities frustrates the policies under the Code.  *A.V. Reilly Int. v. Rosenweig*, 239 B.R. 905, 910 (Bankr. N.D. Ill. 1999); *see also In re Katz*, 203 B.R. 227, 233 (Bankr. E.D. Pa. 1996).  Courts are entitled to insist upon good faith representations.  *In re Hannigan*, 2005 U.S. App. LEXIS 10050, at *6-7.  The Supreme Court has held that the "fresh start" provided for under the Bankruptcy Code is not a fundamental right, but rather intended for the "honest but unfortunate debtor."  *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).  Debtors pay the price of honesty to obtain the benefits of bankruptcy.  Conversely, debtors suffer the consequences of dishonesty when caught.  Thus, when a trustee can establish active concealment of assets, debtors must be prohibited from later amending their exemptions.[2]

An amendment to a debtor's exemptions may also be disallowed if the court finds prejudice to the creditors—even absent any evidence of bad faith.  *In re Williamson*, 804 F.2d at 1358.  In considering whether there is prejudice, the court considers, for instance, whether a trustee acted in reliance upon a debtor's omissions, and whether that reliance was to the detriment of the trustee.  *Id.* at 508.  Thus, if the trustee is aware of the truth from the start, a court might conclude that the there was no prejudice to the trustee stemming from the debtor's omissions.  "Prejudice involves creditors (and presumably the Trustee on their behalf) adopting a litigation position to their detriment in reliance upon conduct of the debtor."  *Id.*; *see also In re Williamson*, 804 F.2d at 1358; *Hardage v. Herring National Bank*, 837 F.2d 1319, 1324 (5th Cir. 1988).  When the creditors would have taken different actions or positions had the exemption been claimed earlier, and the parties were detrimentally affected, then prejudice to creditors

---

[2] A debtor may actually face far more serious consequences under a finding that he concealed assets.  The debtor may be denied the exemption in full or denied a discharge.  *See, e.g. In re Mosby*, 244 B.R. 79, 85 (Bankr. E.D. Va. 2000); *In re Rosenzweig*, 239 B.R. 905 (Bankr. N.D. Ill. 1999); *In re Katz*, 203 B.R. 227 (Bankr. E.D. Pa. 1996).  Under some circumstances, the debtor may even be subject to criminal sanctions.  *See, e.g., United States v. Beard*, 913 F.2d 193 (5th Cir. 1990); *In re Grogan*, 300 B.R. at 809 n.16; *United States v. Grant*, 971 F.2d 799 (1st Cir. 1992); *United States v. Jackson*, 836 F.2d 324 (7th Cir. 1987); *United States v. Cherek*, 734 F.2d 1248 (7th Cir. 1984).

exists and the amendment should be denied.  *In re Bowen*, 2005 Bankr. LEXIS 824, at *13 (Bankr. N.D. Tex. Feb. 7, 2005) (quoting *In re Talmo*, 185 B.R. 637, 645 (Bankr. S.D. Fla. 1995)).

## Analysis

The question before the Court is whether the Debtors are entitled to modify their exemptions if the original exemptions were knowingly and intentionally filed with a gross undervaluation.  The Trustee argues that the Debtors' deliberate failure to disclose the accurate value of their real property is an act of bad faith sufficient to bar the Debtors' ability to amend their original federal exemptions to state exemptions.  The Court agrees.

The facts of *In re Bauer* are very similar to the present case.  In *Bauer*, the debtors originally listed the value of their homestead at $80,000 and elected the federal exemptions pursuant to § 522(d).  *In re Bauer*, 298 B.R. at 355.  Less than six months later, the Debtors amended their schedules, increasing the value of the homestead to $203,000 and electing state exemptions to assert a homestead exemption of nearly equal value.  *Id.* at 356.  The bankruptcy court denied the debtors' homestead exemption after a finding that the debtors sought the amended exemption in bad faith.  *Id.*  The district court affirmed.

The facts of *Hannigan* are also similar to the facts before the Court.  In *Hannigan*, the debtor originally scheduled the value of his homestead at $135,000 and subsequently sought to amend the value to $300,000.  *In re Hannigan*, 2005 U.S. App. LEXIS 10050, at *1-2.  As with the present facts, the debtor in *Hannigan* divided his property into two parcels, at first only listing the value of one of the parcels.  *Id.* at *2-4.  Upon review of the § 341 meeting, the bankruptcy court concluded that the Debtor should have known that the trustee was seeking information regarding the value of both parcels.  *Id.* at *4.  Thus, "the Debtor and his counsel

cannot credibly assert that they did not know that they were supposed to provide an appraisal for the entire Property." *Id.* at *4. The court in *Hannigan* concluded that, as the debtor knew that the scheduled value was inaccurate and did nothing to fix the problem or bring it to the trustee's attention, the debtor intentionally undervalued the property. *Id.* at *5. The bankruptcy court therefore denied the debtor's motion to amend his exemptions. *Id.* at *2. The district and circuit court affirmed.

In the present case, the Debtors filed their original schedules on May 12, 2004. The Trustee discussed the Debtors' homestead exemption during the § 341 meeting on July 22, 2004. The Trustee informed the Debtors that research done prior to the § 341 meeting revealed that the $330,000 scheduled by the Debtors was in fact just $22,000 more than what the Trustee believed was the accurate value for just one of the two parcels. The Trustee expressed concern regarding the second tract being valued at an additional $225,000 and the house built roughly two years earlier for nearly $200,000. As in *Hannigan*, the Unruhs should have known from at least July 22, 2004, that the Trustee had concerns over the scheduled value of the property, and whether the value of the total acreage and the house had been included. Nonetheless, the Debtors failed to adjust the value of the property to any extent when they filed an Amended Schedule C on December 23, 2004. The Debtors only modified the value of the property in response to the Trustee's objection to exemptions filed on January 19, 2005. It was at this point that the Debtors immediately amended Schedule C on February 11, 2005 to reflect the information that the Debtors possessed from the start of the case.

During the hearings, Mr. and Mrs. Unruh gave extensive testimony regarding the dispute over their homestead exemption. On the whole, the testimony lacked credibility. Although the Unruh's allege that they had investigated the records of the Galveston County Appraisal District,

the evidence reflects that this "investigation" was actually an after-the-fact attempt to justify a low value on the property.  The Court concludes that the Unruhs knew—from the beginning of this case—that their property had a value that was significantly higher than the value listed on the schedules.  Nonetheless, they waited nine months after filing their original schedules to submit the second Amended Schedule C with an accurate disclosure as to their homestead.

Moreover, the Unruhs' conduct in obtaining financing for their home is instructive. There was substantial evidence about the multiple appraisals on the property and whether the Unruhs comprehended the basis of the appraisals and the loan to value requirements for their loan.  A series of appraisals were obtained in order for the Unruhs to arrange to refinance the construction loan on their home.  Notwithstanding their testimony to the contrary, the Unruhs were aware of the appraisal requirements for their home.  At times, the Unruhs attempted to rely on the appraisals of segments of the property—and to ignore the substantially higher value for the balance of their property.  At other times, the Unruhs attempted to rely on tax appraisals of the property as unimproved property—even though they knew that they had constructed a home on the property valued at around $200,000.  The Court concludes that the Unruhs understood that the refinancing of their home required loan to value ratios acceptable to their lender, and required that the appraisals be only on 30 acres of the 70 acre property.  With that knowledge, the Unruhs knew that the value listed on their original schedules for the entire property was false.

At times, the Unruhs claimed that they were unaware of certain appraisals and had not been provided with copies of the final appraisal.  The Court finds that the evidence to the contrary is substantially more credible.  The Unruhs were provided with the final appraisal at or about the time of the refinancing.  The refinancing occurred just days before the filing of this

bankruptcy case.  The Unruhs were keenly aware of the appraisals and valuations when they chose to mislead their creditors and this Court.

The Court reviews these events under a totality of the circumstances test.  However, there is virtually no credible evidence to suggest that the Debtors did not act knowingly and intentionally when grossly undervaluing their property both in the original and first amended Schedule C.  The totality of the circumstances in the present case strongly suggests bad faith on the part of the Debtors.  The Court finds that the Debtors: 1) failed to answer the Trustee's questions honestly at the § 341 meeting, 2) failed to correct the valuation in their first amended Schedule C, 3) waited nine months before providing an accurate Schedule C, and 4) gave inconsistent and perhaps untruthful testimony to the Court.  These findings indicate that the Unruhs engaged in active concealment of assets of the estate.

The Unruhs argue that the Trustee must demonstrate prejudice to creditors in addition to bad faith.  They rely principally on *McFatter v. Cage*, 204 B.R. 503 (S.D. Tex. 1996).  However, as stated above, *McFatter* does not require a showing of both bad faith *and* prejudice.  *McFatter* uses the test from *In re Williamson*, 804 F.2d 1355, and thus requires a showing of bad faith *or* prejudice.  *McFatter*, 204 B.R. at 508; *In re Williamson*, 804 F.2d at 1358 ("amendments ought to be allowed…in the absence of bad faith or prejudice.")(citing *Thompson v. Powell*, 413 F.2d 276, 277 (5th Cir. 1969)).

Nevertheless, the Court concludes that there was prejudice to the creditors of the Estate. In evaluating the prejudice, it is helpful to understand the Unruh's motives in undervaluing their property.  Most debtors in Texas claim state exemptions under § 522.  Texas state exemptions allow debtors to claim an unlimited homestead exemption.   Conversely,  under  the  federal

exemption scheme, the homestead exemption is severely limited.  However, Texas law does not allow any claim for exemption for an interest in the stock of a corporation.

At the commencement of the case, the Unruhs owned 1000 shares of stock in Nell International and 1000 shares of stock in Custom Injection Molding—with a collective value of $2,000 claimed on Schedule C—and a controlling interest in both companies.  They claimed that interest as exempt under the federal exemptions.  Had they failed to claim federal exemptions, their business interest would have been controlled by the trustee rather than by the Unruhs. Accordingly, claiming federal exemptions (with a low homestead value) allowed the Unruhs to exempt both their business assets and their homestead.  If the true value of the homestead had been disclosed, the Unruhs would have been forced to choose between exempting their business or their homestead.

The evidence reflects that the Unruhs did not use the "last dollar" of their federal exemptions.  Had they done so, it would have been even more persuasive proof of bad faith— and would have suggested that the undervaluation was done on advice of counsel.  The evidence is uncontroverted that the Unruhs determined the homestead valuation without the advice of their counsel.  Although that fact constitutes some evidence that these actions were not part of an illegal exemption scheme, the Court—based on the totality of circumstances—concludes that the Unruhs intentionally undervalued their homestead.  It does not take a great deal of legal sophistication to comprehend that low asset values might be of benefit in a bankruptcy case. That the Unruhs devised this scheme on their own does not make it an excusable scheme.

Because of the claim of exemptions on the interest in their businesses, the Unruhs maintained control of the businesses throughout their chapter 7 case.  Indeed, at one point, the Court held a hearing on the motion of a creditor and determined that the businesses had a low

value. However, the trustee has now adduced additional evidence regarding the cash flows and value of the businesses. The trustee was deprived of the ability to control the businesses and use his efforts to maximize their value.

If the Court allowed the Unruhs to shift to state exemptions, Nell International would now be transferred to the Trustee. However, the Trustee's business opportunity has now been decimated by the Unruhs. During the course of this bankruptcy case, the Unruhs caused Nell International to file for bankruptcy under chapter 11. Accordingly, the prejudice to the Trustee of allowing the exemption shift would be severe. If the state exemptions had originally been claimed, the Trustee would have had the opportunity to deal with and attempt to sell an active business. If the shift to state exemptions is allowed, the Trustee will lose his rights in the homestead and will receive the stock of a business that was forced to file chapter 11 bankruptcy.

Although the monetary extent of the prejudice is not presently determinable, the Court does not believe that a monetary measure is required. A trustee's loss of a reasonable opportunity to maximize the value of the estate to creditors is a sufficient prejudice to satisfy the requirements under *Williamson*. What is relevant is that the Trustee in this case would have taken a significantly different approach in pursuing the interests of the Estate. Such circumstances warrant a finding of "prejudice to creditors" as contemplated by *Williamson*.

The motion to abandon the Debtors' homestead or amend exemptions is denied. The Trustee's Objection to Exemptions is granted. The Debtors are denied exemptions to the extent that they exceed federal exemptions provided for under the Code. The Trustee's Amended Motion to Sell Real Property is granted. The Trustee's proposed auction process is granted, and the Trustee is granted leave to sell the relevant property (known as FM 517 East in Galveston County, Dickinson, Texas).

Signed at Houston, Texas on June 16, 2005.

MARVIN ISGUR
United States Bankruptcy Judge